IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


THE WAY INTERNATIONAL, INC.,　　　:

　　　　Plaintiff,　　　　　　:
　　　　　　　　　　　　　　　　　Case No. 3:07cv294
　　　　vs.　　　　　　　　　:
　　　　　　　　　　　　　　　JUDGE WALTER HERBERT RICE
EXECUTIVE RISK INDEMNITY,　　:
INC., et al,　　　　　　　　　:

　　　　Defendants.　　　　　:

---

DECISION AND ENTRY OVERRULING OBJECTIONS OF DEFENDANT
EXECUTIVE RISK INDEMNITY, INC., (DOC. #96) TO REPORT AND
RECOMMENDATIONS OF THE UNITED STATES MAGISTRATE JUDGE
(DOC. #95); DECISION AND ENTRY OVERRULING IN PART AND
OVERRULING, AS MOOT, IN PART PLAINTIFF'S OBJECTIONS
(DOC. #99) TO REPORT AND RECOMMENDATIONS OF THE UNITED
STATES MAGISTRATE JUDGE (DOC. #95); REPORT AND
RECOMMENDATIONS OF THE UNITED STATES MAGISTRATE JUDGE
(DOC. #95) ADOPTED IN PART, AS SUPPLEMENTED HEREIN BY
COURT'S REASONING AND CITATIONS TO AUTHORITY; DECISION
AND ENTRY OVERRULING, AS MOOT, MOTION TO DISMISS COUNT
TWO OF PLAINTIFFS' COMPLAINT OF DEFENDANT EXECUTIVE RISK
INDEMNITY, INC. (DOC. #7); DECISION AND ENTRY OVERRULING,
WITHOUT PREJUDICE, PLAINTIFF'S MOTION TO COMPEL
DISCOVERY (DOC. #63); DECISION AND ENTRY SUSTAINING
MOTION TO STRIKE EXPERT TESTIMONY OF DEFENDANT
EXECUTIVE RISK INDEMNITY, INC. (DOC. #80); DECISION AND
ENTRY SUSTAINING IN PART AND OVERRULING IN PART MOTION
FOR SUMMARY JUDGMENT OF DEFENDANT EXECUTIVE RISK
INDEMNITY, INC. (DOC. #84)

---

This litigation arises out of the denial of coverage by Defendant Executive Risk Indemnity, Inc. ("Defendant" or "Executive Risk"),[1] under an insurance policy it had issued to Plaintiff The Way International, Inc. ("Plaintiff"),[2] in an action filed in Tennessee state court, referred to as the Peeler action. As a consequence, Plaintiff incurred substantial expenses for the defense of that lawsuit. In its Complaint (Doc. #3), Plaintiff sets forth two claims against Executive Risk, to wit: a claim of breach of contract, the insurance policy (First Claim for Relief), and a claim of bad faith denial of coverage (Second Claim for Relief).

The following motions are pending in this litigation, to wit: 1) Executive Risk's Motion to Dismiss Plaintiff's Second Claim for Relief (Doc. #7); 2) Plaintiff's Motion to Compel Discovery (Doc. #63); 3) Executive Risk's Motion to Strike Expert Testimony (Doc. #80); and 4) Executive Risk's Motion for Summary Judgment (Doc. #84). This Court referred the first three of those motions to

_____

[1]Although the Plaintiff named numerous Defendants in its Complaint, Executive Risk is the sole remaining Defendant. See Notation Order sustaining Joint Motion to Dismiss (Doc. #11), with which Plaintiff and Defendants Executive Risk, Executive Risk Inc., Chubb & Son Inc., Chubb Group of Insurance Companies, Chubb Executive Risk Inc., Chubb Indemnity Insurance Company and Chubb National Insurance Company sought dismissal of all such Defendants other than Executive Risk; see also Court's Decision of January 7, 2009 (Doc. #93), adopting Report and Recommendations of Magistrate Judge and dismissing, with prejudice, Defendants Baldwin & Whitney Insurance Agency, Inc., Accordia of Ohio, LLC, Accordia, Inc., and Wells Fargo Insurance Services of Ohio, LLC.

[2]The Complaint actually names two Plaintiffs in this litigation, to wit: The Way International, Inc., and The Way International. See Doc. #3 at ¶ 1. However, Plaintiff alleges that "The Way International" is merely its corporate name, rather than being a separate entity. Therefore, this Court concludes that The Way International is not sui juris. See State ex rel. Becker v. Lions Den Adult Bookstore, 1991 WL 271652 (Ohio App. 1991) (vacating judgement entered in favor of plaintiff, in part because the name "Lions Den Adult Bookstore" was not identified as a corporation, individual, partnership or other sui juris entity).

United States Magistrate Judge Sharon Ovington for a report and recommendations. Judge Ovington has filed such a Report and Recommendations (Doc. #95), to which both parties have objected. <u>See</u> Doc. #96 (Executive's Risk's Objections) and Doc. #99 (Plaintiff's Objections). Of present importance, that judicial officer recommended that this Court sustain Executive Risk's Motion to Strike Expert Testimony (Doc. #80). <u>See</u> Doc. #95 at 24-29. The Plaintiff has objected to that particular recommendation. <u>See</u> Doc. #99. As a means of analysis, the Court will initially address Plaintiff's Objections to Judge Ovington's recommendation that the Court sustain Executive Risk's Motion to Strike Expert Testimony (Doc. #80).[3] The Court will then rule on Executive Risk's Motion for Summary Judgment (Doc. #84), a ruling which could moot the need for the Court to rule on the parties' Objections to the Magistrate Judge's recommendations concerning Executive Risk's Motion to Dismiss Plaintiff's Second Claim for Relief (Doc. #7) and Plaintiff's Motion to Compel Discovery (Doc. #63).[4] The Court begins by setting forth the standard of review it must apply when ruling on the Plaintiff's objections to the Report and Recommendation, as it pertains to Executive Risk's Motion to Strike Expert Testimony (Doc. #80), before reviewing the familiar

---

[3]With that motion, Executive Risk has requested that the Court strike Plaintiff's expert witness, Robert Rutter ("Rutter"). Since Plaintiff has appended Rutter's affidavit and report to its memorandum opposing Executive Risk's request for summary judgment (<u>see</u> Doc. #87 at Ex. 16), this Court must determine whether it can consider that evidence when ruling Executive Risk's Motion for Summary Judgment (Doc. #84), before ruling on the summary judgment motion.

[4]Given that Plaintiff did not respond to Executive Risk's request for summary judgment with an affidavit in accordance with Rule 56(f) of the Federal Rules of Civil Procedure, it is not necessary for the Court to rule on the parties' discovery dispute before turning to Defendant's Motion for Summary Judgment (Doc. #84).

procedural standards it must apply whenever it rules on a motion for summary judgment.

I.  Standard of Review of Magistrate Judge's Report and Recommendations and Procedural Standards Applicable to Motions for Summary Judgment

Under Rule 72(a) of the Federal Rules of Civil Procedure, a District Court cannot set aside any part of a Magistrate Judge's order pertaining to a pretrial matter which is nondispositive, unless it is clearly erroneous or contrary to law.[5]  A decision is clearly erroneous "where, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  Center for Bio-Ethical Reform, Inc. v. City of Springboro, 477 F.3d 807, 825 (6th Cir. 2007) (internal quotation marks and citation omitted).  The decision of a Magistrate Judge is contrary to law, "if it applies an incorrect legal standard or fails to consider an element of the applicable standard."  Na Pali Haweo Community Ass'n v. Grande, 252 F.R.D. 672, 674 (D.Hawaii 2008) (internal quotation marks and citation omitted).

---

[5]Rule 72(a) provides:
> (a) Nondispositive Matters.  When a pretrial matter not dispositive of a party's claim or defense is referred to a magistrate judge to hear and decide, the magistrate judge must promptly conduct the required proceedings and, when appropriate, issue a written order stating the decision.  A party may serve and file objections to the order within 10 days after being served with a copy.  A party may not assign as error a defect in the order not timely objected to.  The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law.

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Of course, the moving party:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Id. at 323. See also Boretti v. Wiscomb, 930 F.2d 1150, 1156 (6th Cir. 1991) (The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial.") (quoting Gutierrez v. Lynch, 826 F.2d 1534, 1536 (6th Cir. 1987)). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." Talley v. Bravo Pitino Restaurant, Ltd., 61 F.3d 1241, 1245 (6th Cir. 1995). Read together, Liberty Lobby and Celotex stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law. Fed.R.Civ.P. 50). Street v. J.C. Bradford & Co., 886 F.2d 1472, 1478 (6th Cir. 1989).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations.  It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  See also Michigan Protection and Advocacy Service, Inc. v. Babin, 18 F.3d 337, 341 (6th Cir. 1994) ("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff.").  Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position.  Celotex Corp., 477 U.S. at 324.  Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  Summary judgment shall be denied "[i]f there are … 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'"  Hancock v. Dodson, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted).  Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party.  Anderson, 477 U.S. at 255 (emphasis added).  If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder.  10A Wright, Miller & Kane, Federal Practice and Procedure, § 2726.  In ruling on a

motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." Interroyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), cert. denied, 494 U.S. 1091 (1990). See also L.S. Heath & Son, Inc. v. AT&T Information Systems, Inc., 9 F.3d 561 (7th Cir. 1993); Skotak v. Tenneco Resins, Inc., 953 F.2d 909, 915 n. 7 (5th Cir.), cert. denied, 506 U.S. 832 (1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment ...."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.


II.  Plaintiff's Objections to the Report and Recommendations Concerning Executive Risk's Motion to Strike Expert Testimony (Doc. #80)

With its Motion to Strike Expert Testimony (Doc. #80), Executive Risk requested that the Court strike the testimony of Robert Rutter ("Rutter"), an attorney retained by Plaintiff to provide expert testimony. Executive Risk argued that Rutter's testimony must be stricken, because it would be comprised of nothing more than his opinions on the law, which are the province of the Court, rather than the subject of expert testimony. Doc. #80 at 11. In opposition, Plaintiff acknowledged that Rutter's Report "contains language which has a proclivity to conclusions of law," while arguing that the proclivity did not justify

excluding the entirety of that Report. Doc. #81 at 4. Plaintiff also cited two

decisions in which courts had held that expert testimony concerning the manner in

which insurance claims are handled is relevant in litigation between an insurance

company and its insured. In her Report and Recommendations, Judge Ovington

concluded that Rutter should not be permitted to testify as an expert in this

litigation. Doc. #95 at 24-29. For reasons which follow, this Court concludes that

Judge Ovington's conclusion in that regard is neither clearly erroneous nor contrary

to law.

Based upon her review of Rutter's Report,[6] Judge Ovington made the

following finding concerning Rutter's opinion:

> The expert report produced by Plaintiffs' designated expert in essence
> asserts Mr. Rutter's opinion as to the manner in which certain critical
> provisions of Plaintiffs' insurance contract with Defendant [Executive Risk]
> should be interpreted (see Doc. #80 at Exh. A, pp. 7-10), analyzed in
> comparison to "standard defense provisions contained in commercial general
> liability and homeowner policies," Ohio law, and general "Rules of Insurance
> Policy Interpretation." (See Id., pp. 3-5, 5-6, & 6-7). In summary, Mr.
> Rutter opines that "ERII should have defended the Peeler lawsuit," and
> "incorrectly refused" to do so, resulting in damages to Plaintiffs. (Id., p.
> 10).

Doc. #95 at 26. The Magistrate Judge also found:

> Like [Coregis Ins. Co.], this Court finds that the proffered expert's report in
> this case contains "inappropriate legal conclusions about . . . the proper
> means of interpreting" the relevant insurance policy language, and "strays . .
> . into an impermissible effort" to usurp the Court's role in resolving "pure
> legal questions." Coregis Ins. Co. v. City of Harrisburg, 2005 WL 2990694,
> at *3 (M.D. Pa. 2005); see also Jimkoski [v. State Fire Mut. Auto Ins. Co.,
> 247 Fed. Appx. 654, 662 (6th Cir. 2007)]; Wells [v. C.J. Mahan Constr.
> Co., 2006 WL 951444, at *6 (Ohio App. 2006)] (trial court erred in allowing

---

[6]Copies of Rutter's Report are attached to Executive Risk's Motion to Strike Expert
Testimony (Doc. #80) and as Exhibit 16 to Plaintiff's Memorandum in Opposition
to Executive Risk's Motion for Summary Judgment (Doc. #87).

expert testimony as to meaning of provision in written shareholder agreement).

Id. at 28-29. Moreover, Judge Ovington also noted that the cases cited by the Plaintiff involved bad faith claims, rather than instances in which a court determined that an expert could testify as to the meaning of an insurance policy, and distinguished those decisions on the basis that she had recommended that this Court dismiss Plaintiff's bad faith claim. Id. at 28.

This Court concludes, as did Judge Ovington, that Rutter's testimony must be stricken, given that Rutter is offering his opinion on questions of law and that "[a]n expert opinion on a question of law is inadmissible." Chavez v. Carranza, 559 F.3d 489, 498 (6th Cir. 2009). See also United States v. Zipkin, 729 F.2d 384, 387 (6th Cir. 1984) (holding that allowing introduction of testimony by a bankruptcy judge testifying as an expert regarding "matters of law" was prejudicial error). Thus, in United States ex rel Compton v. Midwest Specialties, Inc., 142 F.3d 296 (6th Cir. 1998), the Sixth Circuit, in the context of rejecting the defendant's argument that the District Court had erroneously failed to credit its expert witness's opinion concerning the meaning of a contract, wrote:

> But, of course, "'experts' may not testify as to the legal effect of a contract." CMI-Trading, Inc. v. Quantum Air, Inc., 98 F.3d 887, 890 (6th Cir. 1996); see also Crow Tribe of Indians v. Racicot, 87 F.3d 1039, 1045 (9th Cir. 1996) ("The interpretation of a contract is an issue of law which this court reviews de novo…. Expert testimony is not proper for issues of law.").

Id. at 302-03. Moreover, a review of Rutter's Report causes this Court to conclude that Judge Ovington's factual findings concerning that Report are not clearly erroneous. Therein that proposed expert witness sets forth his interpretation of the insurance policy between Plaintiff and Executive Risk. For

instance, Rutter's Report contains a section on the rules employed under Ohio law to construe an insurance policy and another section setting forth Rutter's opinion of a reasonable construction of an exclusion in that policy. Moreover, Rutter discusses legal principles throughout his Report. In addition, Plaintiff argues in its Objections that this Court should reverse the decision of the Magistrate Judge, since Rutter's Report relates to its bad faith claim. See Doc. #99 at 13. Since this Court concludes below that Executive Risk is entitled to summary judgment on Plaintiff's bad faith claim, it rejects Plaintiff's argument that Judge Ovington's decision was erroneous, given that Plaintiff's bad faith claim is no longer viable.

Accordingly, the Court overrules Plaintiff's Objections (Doc. #99) to the Report and Recommendations of the Magistrate Judge (Doc. #95), as that judicial document relates to Executive Risk's Motion to Strike Expert Testimony (Doc. #80). That motion is sustained. Consequently, the Court adopts that part of the Report and Recommendations, as supplemented herein by the Court's reasoning and citations to authority, applicable to that motion.

## III. Executive Risk's Motion for Summary Judgment (Doc. #84)

As indicated above, Plaintiff has set forth two claims for relief against Executive Risk, a claim of breach of contract, the insurance policy issued to it by Defendant, and a claim of bad faith denial of coverage and a defense. With its motion, Executive Risk seeks summary judgment on both claims.[7] As a means of

---

[7]Executive Risk's arguments in support of summary judgment are set forth in its Memorandum of Points and Authorities in Support of Motion for Summary Judgment (Doc. #85).

analysis, the Court will address the parties' arguments concerning Plaintiff's breach of contract claim, before turning to their assertions pertaining to its bad faith claim.

A. Breach of Contract

On June 14, 2002, Ronald and Paige Peeler, former adherents of the Plaintiff filed suit against it and six individuals in Circuit Court for Hamilton County, Tennessee.[8]  Therein, the Peelers alleged that, throughout their affiliation with the Plaintiff as adherents, it demanded that they and other adherents make significant contributions, which they did during their affiliations.  According to the Peelers, Plaintiff indoctrinates its affiliates, adherents and followers in order to gain control over their personal lives, careers and finances to support its covert agenda and questionable pursuits.  Additionally, they contend that, during the recruitment of prospective affiliates, Plaintiff uses mind renewal practices, which are nothing more than preconceived and deceitful methods to destroy the prospective affiliate's God-given sense of self, self-esteem, self-worth and individuality, in order to induce, produce and maintain dependency upon it.  The Peelers also assert that Plaintiff conducted its business in such a manner that its adherents, such as themselves, are encouraged to become economically and psychologically dependent upon it and its leadership.  In addition, they contend that they suffered significant psychological and emotional stress as a result of the manipulative conduct and exploitative pressure exerted upon them by Plaintiff during their affiliation.  In their Complaint, the Peelers set forth six claims for relief under the law of Tennessee, to

_____

[8]Authenticated copies of the Complaint in the Peeler litigation have been submitted with Executive Risks Motion for Summary Judgment (see Doc. #86 at Ex. 3), and with Plaintiff's opposition thereto.  See Doc. #87 at Ex. 3.

wit: 1) a claim of negligent misrepresentations, fraud and deceit; 2) a claim of malicious and intentional infliction of psychological and emotional distress; 3) a claim under a Tennessee consumer protection statute; 4) a claim of breach of fiduciary duty; 5) a claim of civil conspiracy; and 6) a claim of breach of promise. The Peelers did not allege that any action of any defendant named therein constituted an invasion of privacy.

Plaintiff submitted that lawsuit to Executive Risk, which had issued Not-For-Profit Organization Directors, Officers and Trustees Liability Insurance Policy No. 751-184872-99 ("the Policy") to the Plaintiff.[9]  On August 1, 2002, Carrie Campi ("Campi"), a claims officer acting on behalf of Executive Risk, sent a letter to Plaintiff's counsel, indicating that the Peeler's "Claim"[10] was excluded from coverage in accordance with Exclusion (C) of the Policy, since the Peelers' Complaint contained allegations of emotional distress and that pleading did not contain any allegation that came within one of the exceptions to Exclusion (C).[11] In his letter to counsel representing Plaintiff, under date of November 27, 2002, Todd McCullough ("McCullough"), a claims examiner acting on behalf of Executive Risk, reconfirmed the information Campi had provided, explaining that Executive

[9]The Peeler action was filed after that policy had expired on September 1, 2000, and after Executive Risk had declined to renew it.  However, Plaintiff had taken advantage of its contractual right to purchase an extended reporting period, which lasted from September 4, 2000, until September 4, 2002, during which the Peeler action was initiated.

[10]It is apparent from that letter that Campi was using the word "Claim" in the manner defined by the Policy, rather than in its generic sense.  Below, this Court sets forth the Policy's definition of Claim.

[11]Executive Risk submitted an authenticated copy of that letter with its motion. See Doc. #86 at Ex. 5.

Risk would not provide a defense in the Peeler action, because the claims set forth in that litigation were excluded from coverage by Exclusion (C), since, under that provision, the entire Policy was inapplicable when there is a claim for emotional distress.[12]

In the First Claim for Relief in its Complaint herein, Plaintiff alleges that Executive Risk breached the contract between the parties, the Policy, by refusing to provide a defense in the Peeler action.[13] Executive Risk argues that it is entitled to summary judgment on this claim, because the claims set forth in the Peeler action were excepted from the Policy by Exclusion (C). Plaintiff, in contrast, argues that this Court must overrule Executive Risk's request for summary judgment on its (Plaintiff's) breach of contract claim for three reasons, to wit: 1) that, under Ohio law, an insurer's duty to defend is broader than its duty to indemnify and that there is an absolute duty to defend which obligated Executive Risk to provide a defense for the Peeler action; 2) that the exclusion to coverage with which Executive Risk denied coverage under the policy, Exclusion (C), should not apply, because it is contrary to Ohio law and makes coverage under the policy illusory; and 3) that, if Exclusion (C) is applicable, the exception set forth in that exclusion renders it inapplicable. Doc. #87 at 1-2. The Court begins its analysis, by reviewing the legal standards which must be employed to ascertain whether an insurance company has a duty to defend an insured which has been sued.

---

[12]Executive Risk has submitted an authenticated copy of McCullough's letter with its motion. See Doc. #86 at Ex. 6.

[13]In its papers, Plaintiff occasionally refers to Defendant's obligation to provide indemnification, as well as a defense. The issue of indemnification is not implicated by this litigation, since Plaintiff prevailed in the Peeler litigation.

In <u>City of Sharonville v. American Employers Insurance Co.</u>, 109 Ohio St.3d 186, 846 N.E.2d 833 (2006), the Ohio Supreme Court reviewed the principles which must be applied under Ohio law to determine whether an insurer has a duty to defend:

> An insurer's duty to defend is broader than and distinct from its duty to indemnify. <u>Socony-Vacuum Oil Co. v. Continental Cas. Co.</u> (1945), 144 Ohio St. 382, 29 O.O. 563, 59 N.E.2d 199, paragraph one of the syllabus; <u>W. Lyman Case & Co. v. Natl. City Corp.</u> (1996), 76 Ohio St.3d 345, 347, 667 N.E.2d 978. An insurer has an absolute duty to defend an action when the complaint contains an allegation in any one of its claims that could arguably be covered by the insurance policy, even in part and even if the allegations are groundless, false, or fraudulent. <u>Sanderson v. Ohio Edison Co.</u> (1994), 69 Ohio St.3d 582, 635 N.E.2d 19, at paragraph one of the syllabus. Once an insurer must defend one claim within a complaint, it must defend the insured on all the other claims within the complaint, even if they bear no relation to the insurance–policy coverage. <u>Preferred Mut. Ins. Co. v. Thompson</u> (1986), 23 Ohio St.3d 78, 80, 491 N.E.2d 688. An insurer need not defend any action or any claims within the complaint when all the claims are clearly and indisputably outside of the contracted policy coverage. <u>Preferred Risk Ins. Co. v. Gill</u> (1987), 30 Ohio St.3d 108, 113, 507 N.E.2d 1118. The duty to defend is further heightened when the insurer expressly states that it will defend claims that are groundless, false, or fraudulent. <u>See</u> <u>Wedge Products, Inc. v. Hartford Equity Sales Co.</u> (1987), 31 Ohio St.3d 65, 67-68, 509 N.E.2d 74; <u>Preferred Risk</u>, <u>supra</u>, at paragraph two of the syllabus. The duty to defend an action is not determined by the action's ultimate outcome or the insurer's ultimate liability. <u>Motorists Mut. Ins. Co. v. Trainor</u> (1973), 33 Ohio St.2d 41, 294 N.E.2d 874, at paragraph two of the syllabus.

<u>Id</u>. at 189, 846 N.E.2d at 837. <u>See</u> <u>also</u> <u>Id</u>. at 186, 846 N.E.2d at 834 (holding in ¶ 1 of the syllabus that "[t]he issuer of a law-enforcement liability insurance policy has a duty to defend its insured against an action when the complaint contains an allegation of conduct that could arguably be considered covered by the policy");

<u>Ohio Govt. Risk Mgt. Plan v. Harrison</u>, 115 Ohio St.3d 241, 874 N.E.2d 1155 (2007) (holding in the syllabus that "[a]n exclusion in an insurance policy will be

interpreted as applying only to that which is clearly intended to be excluded");

Cincinnati Indemnity Co. v. Martin, 85 Ohio St.3d 604, 605, 710 N.E.2d 677, 678 (1999) (stating that there is no duty to defend, "if there is no set of facts alleged in the complaint [against the insured] which, if proven true, would invoke coverage").

In City of Sharonville, supra, the Ohio Supreme Court also restated the principles which must be applied when a court interprets an insurance policy under Ohio law:

> An insurance policy is a contract whose interpretation is a matter of law. Alexander v. Buckeye Pipe Line Co. (1978), 53 Ohio St.2d 241, 374 N.E.2d 146, paragraph one of the syllabus. Contract terms are to be given their plain and ordinary meaning. Gomolka v. State Auto. Mut. Ins. Co. (1982), 70 Ohio St.2d 166, 167-168, 436 N.E.2d 1347. If provisions are susceptible of more than one interpretation, they "will be construed strictly against the insurer and liberally in favor of the insured." King v. Nationwide Ins. Co. (1988), 35 Ohio St.3d 208, 519 N.E.2d 1380, syllabus. Additionally, "an exclusion in an insurance policy will be interpreted as applying only to that which is <u>clearly</u> intended to be excluded." (Emphasis sic.) Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd. (1992), 64 Ohio St.3d 657, 665, 597 N.E.2d 1096.

109 Ohio St. 3d at 187, 846 N.E.2d at 836.

Section I of the Policy, which contains Executive Risk's agreement to indemnify and to defend Plaintiff, provides in relevant part:

**I. INSURING AGREEMENTS**

(A) The Underwriter will pay on behalf of the **Insured Persons Loss** for **Claims** made against them during the **Policy Period** for their **Wrongful Acts**, unless the **Insured Entity** pays such **Loss** to or on behalf of the **Insured Persons** as indemnification.

      \*           \*           \*

(C) The Underwriter will pay on behalf of the **INSURED ENTITY LOSS** for **CLAIMS** made against the **INSURED ENTITY** during the **POLICY PERIOD** for its **WRONGFUL ACTS**.

In addition to the limit of liability set forth in ITEM 3 of the Declarations, the Underwriter will have the right and duty to defend any **CLAIM** described

INSURING AGREEMENT (A), (B) or (C), even if such **CLAIM** is groundless, false or fraudulent.

Doc. #86 at Ex. 2, p. 1.[14] The declarations page of the Policy identifies Plaintiff as the insured entity. An insured person is defined by the Policy, as "any past, present or future director, officer, trustee, employee, volunteer or member of the staff, faculty or any duly constituted committee of the **Insured Entity**." Id. at 2. Claim is defined by the Policy as written notice received by an insured that a person or entity intends to hold an insured responsible for a "wrongful act." Id. The Policy defines "wrongful act," in relevant part, as:

> **(Q) WRONGFUL ACT** means:
> (1) any **Employment Practices Wrongful Act** or **Personal Injury Wrongful Act** or other actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by an **Insured Person** in his or her capacity as such.
>
>        *             *           *
>
> (3) any **Employment Practices Wrongful Act** or **Personal Injury Wrongful Act** or other actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by the **Insured Entity**.

Id. at 3.

Executive Risk has not argued that the matters set forth in the Peeler litigation do not come within the insuring agreement contained in the Policy. Rather, it declined to defend Plaintiff in that lawsuit, because it concluded that the policy's Exclusion (C) precluded coverage for the claims set forth therein. Exclusion (C) provides:

> This Policy does not apply to **Claims** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any

---

[14]Herein, the Court cites to the page numbers of the Policy itself, without counting the declarations page and endorsements which proceed the Policy in Exhibit 2 to Doc. #86.

actual or alleged bodily injury, sickness, mental anguish, emotional distress, disease or death of any person, damage to or destruction of any tangible property including loss of use thereof. This EXCLUSION (C) will not, however, apply to allegations of mental anguish or emotional distress to the extent that such allegations are part of a **Claim** for an **Employment Practices Wrongful Act** or **Personal Injury Wrongful Act**.

Id. at 4-5. The term "Employment Practices Wrongful Act" is defined by Section

II(D) of the policy to mean:

> any actual or alleged:
> (1) wrongful termination of the employment of, or demotion of or failure or refusal to hire or promote any person;
> (2) discrimination or sexual harassment adversely affecting any employee of, or applicant for employment with, the Insured Entity; or
> (3) retaliatory treatment against an employee of the Insured Entity on account of such employee's exercise or attempted exercise of his or her rights under law.

Id. at p. 2. The term "Personal Injury Wrongful Act" is defined Section II(L) of the

policy as:

> any actual or alleged:
> (1) false arrest, wrongful detention or imprisonment or malicious prosecution;
> (2) libel, slander, defamation of character or invasion of privacy;
> (3) wrongful entry, eviction or other invasion of the right of privacy;
> (4) infringement of copyright or trademark or other unauthorized use of title; or
> (5) plagiarism or misappropriation of ideas.

Id. at p. 3.

It cannot be questioned that Exclusion (C) is applicable herein, given that the

Peelers have set forth a claim of malicious and intentional infliction of psychological

and emotional distress in their Complaint and Exclusion (C) excludes coverage for

such claims. While acknowledging that the Peelers set forth a claim for emotional

distress, Plaintiff points out that their Complaint contained other claims, such as

negligent misrepresentations, fraud, deceit, violations of the Tennessee Consumer Protection Act, breach of fiduciary duty and breach of promise.  See Doc. #87 at 13.  Plaintiff argues that many of those claims constitute "wrongful acts," as that term is defined by the Policy, and that, therefore, the absolute duty to defend rule obligated Executive Risk to provide a defense in the Peeler litigation.  Id. in support of that proposition, Plaintiff relies upon the decision of the Ohio Supreme Court in Sanderson v. Ohio Edison Co., 69 Ohio St.3d 588, 635 N.E.2d 19  (1994), wherein the Ohio Supreme Court held in ¶ 1 of the Syllabus:

> 1. An insurance policy which states that the insurer is obligated to defend in any action seeking damages payable under the policy against the insured, even where the allegations are groundless, false or fraudulent, imposes an absolute duty upon the insurer to assume the defense of the action where the complaint states a claim which is partially or arguably within policy coverage.

Id., 635 N.E.2d at 21.[15]  Accord, Ganim v. Columbia Cas. Co., 574 F.3d 305, 307 (6th Cir. 2009).  In addition, Plaintiff points out that, when an insurer must defend its insured on one claim in a complaint, it must defend on all other claims set forth in that pleading.  Doc. #87 at 13 (citing City of Sharonville, 109 Ohio St.3d at 189, 846 N.E.2d at 837).

In contrast, Executive Risk contends that, even though the Peelers set forth other claims in their Complaint, which come within the Policy's definition of "wrongful acts," in addition to their claim intentional infliction of emotional distress, all such claims are also excluded from coverage by Exclusion (C), because those other claims "'directly or indirectly result[ed] from . . . or in any way

---

[15]In City of Sharonville, supra, which is quoted above, the Ohio Supreme Court cited Sanderson in support of the same proposition.

involv[ed] . . . mental anguish or emotional distress.'" Doc. #91 at 3 (quoting

Exclusion (C)). In support of that proposition, Executive Risk relies on <u>Ferro Corp.</u>

<u>v. Cookson Group</u>, 561 F. Supp.2d 888 (N.D.Ohio 2008), wherein the court stated

that "[t]he nature of the claims in the complaint cannot be divorced from the

factual allegations upon which those claims are based." <u>Id</u>. at 907 (internal

quotation marks and citation omitted). In support of its motion, Executive Risk has

argued the gravamen of the Peelers' claims was the assertion that the Plaintiff,

through its indoctrination practices, psychologically and emotionally manipulated

them, overwhelming their free will. Doc. #85 at 3. In addition, Executive Risk

contends:

> Even apart from the obvious fact that the Peeler Complaint includes a cause
> of action for "malicious and intentional infliction of psychological and
> emotional distress," the factual allegations underlying all of the causes of
> action also make clear that the Peeler Action "in [some] way involv[ed]"
> actual or alleged mental anguish or emotional distress. The Peelers alleged,
> among other similar allegations, that [Plaintiff] "engaged in an oppressive
> and manipulative course of exerting undue influence techniques upon its . . .
> adherents" in order to " condition" the adherents " to become economically
> and psychologically dependent on [Plaintiff]." Peeler Complaint at ¶¶ 15 and
> 17. The Peelers further alleged that [Plaintiff's] practices were designed " to
> gain control over [adherents' ] personal lives," and that those practices were
> " nothing but a preconceived and deceitful method to destroy [a] potential
> affiliate's God given sense of self, self-esteem, self-work and individuality."
> Peeler Complaint at ¶¶ 14 and 19.
>
> In fact, [Plaintiff] emphasized the commonality of the facts underlying
> the Peelers' causes of action when it successfully moved for summary
> judgment in the Peeler Action and again when it defended that judgment on
> appeal. <u>See, e.g.</u>, Appellate Brief at 45 ("The Peelers now claim that
> because of their 'mind control,' 'indoctrination,' and 'coercive persuasion,'
> choices that they previously made in life were somehow not voluntary and
> are thus actionable. <u>The Peelers' entire case rests on this theory</u>." )
> (emphasis added). Hence, every cause of action in the Peeler Complaint
> arises from the Peelers' allegations of mental anguish and emotional distress
> and Exclusion III(C) precluded coverage for the Peeler Action in its entirety.

Id. at 9-10.  In its reply, Executive Risk emphasizes that the Plaintiff took the position in its memorandum in opposition that psychological stress, coercion and manipulation underlay all of the Peelers' "theories of recovery."  Doc. #91 at 3 (citing Doc. #87 at 6-8).[16]

This Court is unable to agree with Executive Risk.  The policy does not define the terms "mental anguish" and "emotional distress."  Although no decision by an Ohio court has defined the term "mental anguish," the Michigan Supreme Court has indicated that this term, in its ordinary and generally understood sense, means "extreme or excruciating pain, distress, or suffering of the mind."  People v. Petrella, 424 Mich. 221, 257, 380 N.W.2d 11, 27 (1985).  See also, Kiepfer v. Beller, 944 F.2d 1213, 1222 (5th Cir. 1991) (defining mental anguish under Texas law as "the emotional pain, torment, and suffering that the named plaintiff would, in reasonable probability, experience as a result of the defendant's tortious behavior") (internal quotation marks and citation omitted).  In Paugh v. Hanks, 6 Ohio St.3d 72, 451 N.E.2d 759 (1983), the Ohio Supreme Court stated "[w]e believe that serious emotional distress describes [an] emotional injury which is both severe and debilitating."  Id. at 78, 451 N.E.2d at 765.  Applying those recognized

_____

[16]Executive Risk also contends that such arguments by Plaintiff in the Tennessee state courts judicially estop it from taking a different position herein.  In order for judicial estoppel to apply, a party must take a position which is inconsistent with one that it successfully pursued in a prior proceeding.  Teledyne Industries, Inc. v. Nat. Labor Relations Bd., 911 F.2d 1214, 1217-18 (6th Cir. 1990).  Given that Plaintiff prevailed in the Tennessee trial and appellate courts, because some of the Peelers' claims were barred by the applicable statute of limitations and others by the First Amendment (see Peeler v. The Way International, Inc., 2006 WL 1864662 (Tenn. App. 2006)), this Court concludes that Plaintiff did not successfully assert in the Tennessee courts the argument that the gravamen of all the Peelers' claims was the infliction of emotional distress in the prior proceeding.  Therefore, judicial estoppel is inapplicable herein.

definitions for "mental anguish" and "emotional distress," this Court concludes that for a claim, directly or indirectly, to arise out of or to result from either "mental anguish" or "emotional distress," that claim must contain an element of mental suffering or injury. The Peelers' claims for violation of the Tennessee consumer protection act, breach of fiduciary duty and breach of promise arise out of the allegation that the Plaintiff was able to separate them from their money, rather than being predicated upon some type of mental suffering or injury they experienced. That fact is confirmed by the Tennessee appellate court, which recognized, during the Peelers' appeal, that their claims can be divided into property damage claims, arising out of the damages they allege to have suffered as a result of making contributions to the Plaintiff, and personal injury claims, those arising out of the mental anguish suffered by the Peelers. See Peeler v. The Way International, Inc., 2006 WL 1864662 (Tenn. App. 2006).

Alternatively, Executive Risk argues that the definition of "Related Claims" in the Policy means that all claims set forth in the Peelers' Complaint, directly or indirectly, arise out of or result from either mental anguish or emotional distress. This Court agrees with Executive Risk that, under the Policy's definition of that term, all claims set forth in that pleading are "Related Claims." However, this Court is unable to agree with Executive Risk that, as a result, all such claims are excluded from coverage in accordance with Exclusion (C). That provision of the Policy does not even refer to "Related Claims," much less indicate that all related claims are excluded from coverage in accordance with it (i.e., Exclusion (C)).[17]

_____

[17]Parenthetically, even if this Court agreed with Executive Risk that all related claims are excepted from coverage by Exclusion (C), which it does not, it is doubtful that it would have concluded that Executive Risk was entitled to summary

Accordingly, this Court overrules Executive Risk's Motion for Summary

Judgment (Doc. #84), as it relates to Plaintiff's claim for breach of contract.[18]

---

judgment as a result. In the text above this Court has cited but a few of the myriad of decisions by the Ohio Supreme Court and other Ohio courts which have held that, as long as an insurer is obligated to provide a defense for one claim, it must defend all claims. With its "related claims" argument, Executive Risk, without citing any Ohio decision in support thereof, would turn that rule on its head and have this Court hold that, as long as the policy does not provide coverage for one claim, all claims are excluded from coverage. Assuming for sake of argument that such would be permissible under Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938), the Sixth Circuit has cautioned that courts "should be extremely cautious about adopting substantive innovation in state law." Combs v. International Ins. Co., 354 F.3d 568, 587 (6th Cir. 2004). That caution would in all likelihood prevent this Court from adopting an innovation to Ohio's insurance law which is seemingly contrary to existing law.

[18]Given that holding, it is not necessary to address Plaintiff's argument that the exception to Exclusion (C) for "Personal Injury Wrongful Act" is applicable and that, therefore, Executive Risk had a duty to defend, regardless of whether the Peelers set forth a claim of emotional distress or mental anguish. That argument is predicated upon the assertion that, in some of the later papers the Peelers filed in their lawsuit, they argued that they possessed a claim of invasion of privacy. In Rogers v. McCullough, 296 F. Supp.2d 895 (W.D.Tenn. 2003), the court elaborated upon the tort of invasion of privacy under the Tennessee common law:

> Tennessee recognizes a cause of action for invasion of privacy. Langford v. Vanderbilt Univ., 199 Tenn. 389, 287 S.W.2d 32, 37-39 (1956). The tort of invasion of privacy is divided into four distinct causes of action: (1) unreasonable intrusion upon the seclusion of another; (2) appropriation of another's name or likeness; (3) public disclosure of private facts; and (4) placing another in a false light to the public. West v. Media Gen. Convergence, Inc., 53 S.W.3d 640, 642-43 (Tenn.2001); Restatement (Second) of Torts § 652A-E (1977).

Id. at 902-03. The Peelers did not set forth such a claim in their Complaint. Whether a claim based upon papers filed after the complaint in a lawsuit can invoke the duty to defend is debatable under Ohio law. See e.g., Erie Ins. Exch. v. Lansberry, 2008 WL 852453, at *8 (Ohio App. 2008) (noting that "courts will not imply that a cause of action has been pled in a complaint merely because the allegations in the complaint indicate that another cause of action might have happened"); Motorists Mut. Ins. Co v. Nat'l Dairy Herd Improvement Ass'n, Inc., 141 Ohio App.3d 269, 279, 750 N.E.2d 1169, 11 (2001).

B.  Bad Faith

With the Second Claim for Relief in its Complaint, Plaintiff has set forth a claim against Executive Risk, alleging that its denial of coverage and failure to provide a defense was in bad faith.  See Doc. #3 at ¶¶ 27-35.  In its Motion for Summary Judgment, Executive Risk argues that it is entitled to summary judgment on this claim, because it is barred by the applicable statute of limitations. Doc. #84 at 12-14.  Alternatively, Executive Risk argues that it is entitled to summary on Plaintiff's bad faith claim, because there is no basis for that claim.  Id. at 14-15.  The Court begins by addressing the parties' arguments concerning Executive Risk's statute of limitations defense.

In its Decision of March 31, 2008 (Doc. #37), this Court overruled the Plaintiff's Supplemental Motion to Remand (Doc. #18).[19]  Plaintiff had argued therein that this Court was without subject matter jurisdiction, since complete diversity was lacking, given that it was uncontroverted that Plaintiff, Defendant Wells Fargo Insurance Services of Ohio, LLC ("Wells Fargo") and three entities alleged by Plaintiff to be Wells Fargo's predecessors (Plaintiff's Complaint (Doc. #3) at ¶¶ 10-11), are citizens of Ohio.  In rejecting the Plaintiff's request for a remand, this Court concluded that Wells Fargo and the three entities had been fraudulently joined, given that its claim against Wells Fargo and the three entities

_____

[19]Plaintiffs initiated this litigation in the Court of Common Pleas for Montgomery County, Ohio.  The Defendants removed this lawsuit to this Court, in accordance with 28 U.S.C. §§ 1332 and 1441.  See Doc. #1.  Section 1441 permits the removal of actions over which District Courts can exercise original subject matter jurisdiction, while District Courts are authorized under § 1332 to exercise subject matter jurisdiction over suits between citizens of different states.  Of course, diversity jurisdiction can be exercised, only when there is complete diversity of citizenship, i.e., all plaintiffs must be citizens of different states than all defendants.  See Strawbridge v. Curtiss, 3 Cranch (7 U.S.) 267 (1806).

was barred by the applicable statute of limitations. The Court explained its
conclusion that such claim was barred by the applicable statute of limitations:

> Wells Fargo was Plaintiffs' insurance agent, which obtained that policy for
> them. In their Complaint, the Plaintiffs contend that Wells Fargo is liable to
> them, under a negligence theory. In particular, they allege that Wells Fargo
> breached its duty of reasonable care and due diligence, by allowing
> Executive Risk to deny coverage in the Peeler action, and/or acting in
> concert with that Defendant to that end. Plaintiffs' Complaint (Doc. #3) at
> ¶¶ 36-40. The parties are in agreement that the Plaintiffs' claim against
> Wells Fargo is governed by the four-year statute of limitations set forth in
> § 2305.09 of the Ohio Revised Code. This litigation was initiated on July 3,
> 2007, when Plaintiffs filed their Complaint in Montgomery County Common
> Pleas Court. Therefore, this Court turns to the question of whether
> Plaintiffs' Complaint demonstrates that their claim against Wells Fargo arose
> before July 3, 2003.
>
> Attached to Plaintiffs' Complaint, inter alia, is a copy of a letter sent
> under date of August 1, 2002, by Carrie Campi, a claims officer for Chubb &
> Sons, the claims representative for Executive Risk, to counsel for the
> Plaintiffs, with a copy to the Plaintiffs. In that letter, she stated that
> coverage for the Peeler action was denied. Another attachment to that
> pleading is a letter, under date of October 3, 2002, from Todd McCullough,
> another claims examiner for Chubb & Sons, to Plaintiffs' counsel, indicating
> that he (McCullough) had taken the file from Campi and would "provide a
> coverage analysis as soon as possible." In their Complaint, Plaintiffs allege
> that Executive Risk denied both coverage for and a defense to the Peeler
> action on November 27, 2002, by correspondence from McCullough.
> Doc. #3 at ¶ 22.
>
> Under Ohio law, the statute of limitations on a tort claim does not
> begin until "there has been an invasion of a legally protected interest." Kunz
> v. Buckeye Union Ins. Co., 1 Ohio St.3d 79, 81, 437 N.E.2d 1194, 1196
> (1982) (internal quotation marks and citation omitted). When the tort claim
> is against an insurance agent such as Wells Fargo, the legally protected
> interest is "in having [insurance] protection when it was needed." Id. at 82,
> 437 N.E.2d at 1197. In the context of a lawsuit or claims against an
> insured by a third-party, Ohio courts have applied Kunz and held the legally
> protected interest is invaded at the time of the occurrence of the loss which
> was supposed to be covered. See e.g., Kosa v. Frederick, 136 Ohio App.3d
> 837, 839, 737 N.E.2d 1071, 1073 (2000). In Kosa, the court held that the
> loss occurred when claims were made against the plaintiff and the defendant
> denied coverage. Id. at 840, 737 N.E.2d at 1173. Herein, that happened
> no later than November 27, 2002, when McCullough informed Plaintiffs that

Executive Risk would not cover the <u>Peeler</u> action.  Indeed, the Plaintiffs allege that they suffered a substantial monetary loss as a result of the denial of coverage.  Plaintiffs' Complaint (Doc. #3) at ¶ 23.

Since this litigation was filed on July 3, 2007, more than four years after the date alleged by Plaintiffs in their Complaint, upon which they contend they suffered a substantial loss as a result of the denial of coverage, the Court concludes that Plaintiffs' Complaint demonstrates, as a matter of law, that their claim against Wells Fargo is barred by the four-year statute of limitations contained in § 2305.09.

Doc. #37 at 6-9 (footnote omitted).  The same reasoning applies to the Plaintiff's

bad faith claim against Executive Risk.

Executive Risk argues that Plaintiff's bad faith claim, like its claim against

Wells Fargo, is governed by the four-year statute of limitations contained in

§ 2305.09 of the Ohio Revised Code,[20] and that the claim arose no later than

November 27, 2002, when McCullough informed Plaintiff that it, as Defendant in

---

[20]Section 2305.09 provides:

Except as provided for in division (C) of this section, an action for any of the following causes shall be brought within four years after the cause thereof accrued:

(A) For trespassing upon real property;
(B) For the recovery of personal property, or for taking or detaining it;
(C) For relief on the ground of fraud, except when the cause of action is a violation of section 2913.49 of the Revised Code, in which case the action shall be brought within five years after the cause thereof accrued;
(D) For an injury to the rights of the plaintiff not arising on contract nor enumerated in sections 1304.35, 2305.10 to 2305.12, and 2305.14 of the Revised Code;
(E) For relief on the grounds of a physical or regulatory taking of real property.

If the action is for trespassing under ground or injury to mines, or for the wrongful taking of personal property, the causes thereof shall not accrue until the wrongdoer is discovered; nor, if it is for fraud, until the fraud is discovered.

The Plaintiff's claim against Wells Fargo and its bad faith claim both fall within the ambit of subsection (D) of that statutory provision.

the Peeler case, would not be provided coverage or a defense that action. In response, Plaintiff has argued that its bad faith claim is not barred by the four-year statute of limitations set forth in § 2305.09, without contending that a different statute of limitations is applicable herein.[21] In addition, Plaintiff has not challenged that it knew, no later than November 27, 2002, that Executive Risk had denied it coverage in the Peeler action. Indeed, Plaintiff has alleged in its Complaint that Executive Risk denied both coverage for and a defense to the Peeler action on November 27, 2002, by correspondence from McCullough. Doc. #3 at ¶ 22. Rather, Plaintiff argues that its bad faith claim did not accrue until July 5, 2006, when judgment was entered in its favor in the Peeler action. The Court now turns to the question of whether Plaintiff's bad faith claim accrued on November 27, 2002, when McCullough informed Plaintiff that Executive Risk would not provide coverage or a defense to the Peeler action, or July 5, 2006, when judgment was entered in Plaintiff's favor in the Peeler action.

Under Ohio law, the statute of limitations on a tort claim does not begin until "there has been an invasion of a legally protected interest." Kunz v. Buckeye Union Ins. Co., 1 Ohio St.3d 79, 81, 437 N.E.2d 1194, 1196 (1982) (internal quotation marks and citation omitted). Thus, it is recognized that the limitations period set forth in § 2305.09(D) "does not begin to run until the plaintiff has suffered an injury as a result of the alleged tortious conduct of the defendant, even if the plaintiff discovered the tortious conduct before the resulting injury has

_____

[21]To oppose this branch of Executive Risk's Motion for Summary Judgment (Doc. #84), Plaintiff has referred to the two memoranda (Docs. ##27 and 52) it filed to oppose Executive Risk's Motion to Dismiss Plaintiff's Second Claim for Relief (Doc. #7). See Doc. #87 at 25-26. That motion was also premised on the proposition that Plaintiff's bad faith claim is barred by § 2305.09.

occurred." <u>Wisecup v. Gulf Development</u>, 56 Ohio App.3d 162, 565 N.E.2d 865, 866 (1989) (syllabus).

Executive Risk argues that Plaintiff suffered such an injury, as a result of its alleged bad faith, at the latest on November 27, 2002, when McCullough informed Plaintiff that Executive Risk would not provide coverage or a defense to the <u>Peeler</u> action, citing <u>Bullet Trucking, Inc. v. Glen Falls Insurance Co.</u>, 84 Ohio App.3d 327, 333, 616 N.E.2d 1123, 1126 (1987) and <u>Stevenson v. First Am. Title Insurance Co.</u>, 2005 WL 3303959 (Ohio App. 2005). In <u>Bullet Trucking</u>, the court held that the plaintiff's claim of bad faith denial of coverage was not barred by § 2305.09, because that claim had accrued on one of two dates when the insurance company informed the plaintiff that it would not provide coverage and both of those dates occurred less than four years before plaintiff had initiated that action. In <u>Stevenson</u>, the court affirmed the grant of summary judgment to the defendant on plaintiff's bad faith denial of coverage claim, since, like this lawsuit, that litigation was filed more than four years after plaintiff had learned, through receipt of notification of withdrawal of representation, that the defendant would not continue to provide a defense.

In response, the Plaintiff relies on a treatise on insurance law, in which it is postulated that an insured's bad faith claim does not accrue until the underlying litigation is resolved. <u>See</u> Doc. #27 at 4 (citing Couch on Insurance 3d). This Court will not follow that treatise, since it is not consistent with <u>Bullet Trucking</u> and <u>Stevenson</u>. Moreover, this Court previously noted that, in <u>Kosa v. Frederick</u>, 136 Ohio App.3d 837, 839, 737 N.E.2d 1071, 1073 (2000), the court held that

an insured's loss occurred when claims were made against him and the defendant denied coverage. Id. at 840, 737 N.E.2d at 1173.

Based on the foregoing, this Court concludes that the Plaintiff's claim of bad faith accrued when it learned that Executive Risk had denied it coverage and/or a defense in the Peeler litigation. Since that occurred no later than November 27, 2002, more than four years before Plaintiff initiated this litigation on July 3, 2007, this claim is barred by the four-year statute of limitations set forth in § 2305.09.

Accordingly, the Court sustains Executive Risk's Motion for Summary Judgment (Doc. #84), as it relates to Plaintiff's bad faith claim. As a result, the Court overrules, as moot, Executive Risk's Motion to Dismiss Plaintiff's Second Claim for Relief (Doc. #7).


Based upon the foregoing, the Court sustains in part and overrules in part Executive Risk's Motion for Summary Judgment (Doc. #84). That motion is sustained as it relates to Plaintiff's bad faith claim and overruled as it pertains to the breach of contract claim. Although the Plaintiff did not move for summary judgment as to liability on its breach of contract claim, it is hard to discern what fact questions are raised by the question of liability on that claim. Of course, the question of the Plaintiff's damages will undoubtedly require a trial to resolve, unless the parties are able to stipulate same. To move this litigation forward, the Court directs the Plaintiff to file a motion, seeking partial summary judgment on the question of Executive Risk's liability for breach of contract, within 30 days from date. The parties may thereafter brief that motion in accordance with the local rules of this Court.

The foregoing leaves for resolution Plaintiff's Motion to Compel Discovery (Doc. #63) and the parties' Objections (Doc. ##96 and 99) to the Report and Recommendations (Doc. #95) of the Magistrate Judge, as that judicial filing relates to that motion.  Given that this Court's rulings herein have greatly altered the framework under which Plaintiff sought an order compelling Executive Risk to produce discovery, the Court overrules Plaintiff's motion, without prejudice to renewal, if the Plaintiff can identify the factual issues in need of resolution to which such discovery requests are now relevant.[22]  Given this Court's gratuitous opinion as to the possible absence of factual issues on Plaintiff's breach of contract claim, such a motion should not be filed, until such time as the Court rules on the motion for partial summary judgment it has ordered Plaintiff to file.  In addition, the Court overrules the parties Objections (Doc. ##96 and 99) to Judge Ovington's Report and Recommendations (Doc. #95), as that judicial filing relates to Plaintiff's Motion to Compel Discovery (Doc. #63), as moot.

September 28, 2009

/s/ Walter Herbert Rice

WALTER HERBERT RICE, JUDGE
UNITED STATES DISTRICT COURT

Copies to:

Counsel of Record.

---

[22]None of the discovery which was the subject of Plaintiff's Motion to Compel sought information pertinent to the amount of damages it suffered, as a result of Defendant's failure to provide a defense in the Peeler litigation.